

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

BTK
F.#2020R00154

*610 Federal Plaza*
*Central Islip, New York 11722*

May 3, 2022

**By ECF and E-mail**

The Honorable Joan M. Azrack
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:    United States v. Arkadiy Khaimov
              <u>Criminal Docket No. 20-267 (JMA)</u>

Dear Judge Azrack:

        The government respectfully submits this letter regarding defendant Arkadiy Khaimov, whose sentencing is scheduled for May 26, 2022. On August 12, 2020, the defendant pleaded guilty to conspiracy to commit mail and wire fraud in violation of Title 18, United States Code, Sections 1341, 1343 and 1349. (See Sept. 30, 2020 United States Probation Dep't ("Probation") Presentence Investigation Report ("PSR") at ¶ 1). Between February 2017 and July 2018, the defendant organized a scheme to defraud a pharmaceutical manufacturer ("John Doe Company 1") of approximately $7.2 million by submitting false claims under a Co-pay Coupon Program (the "Co-pay Program") that John Doe Company 1 instituted to provide the uninsured and those in need of financial assistance with access to a "groundbreaking therapy" (the "Medication") that treated a disease afflicting millions of people who faced "serious and life-threatening consequences" without access to the Medication. (See PSR at ¶¶ 5-9; Oct. 27, 2020 Second Addendum to the Presentence Report ("APSR 1") at 1). Because of the defendant's scheme, funds intended for the needy were instead diverted to the defendant and his co-conspirators, who lined their pockets with stolen cash. As described below, the Court should impose a sentence within the United States Sentencing Guidelines ("Guidelines") range of 51-63 months' imprisonment, to be followed by three years of supervised release. In addition, the Court should enter a forfeiture judgment of $489,534.25 and enter an Order of Restitution of $7.2 million in favor of John Doe Company 1.

I.      Procedural Background

On August 12, 2020, before the Honorable A. Kathleen Tomlinson, the defendant pleaded guilty to a single-count Indictment, charging him with conspiracy to commit mail and wire fraud.  (PSR at ¶ 1).

II.     The Offense Conduct

Between 2017 and 2018, the defendant organized a scheme to defraud John Doe Company 1 of Co-pay Coupon Program payments that were intended to lower the cost of the Medication, a "priceless breakthrough" that offered a "potential [] cure" to more than 2 million people suffering the effects of a disease with "serious and life-threatening consequences."  (APSR at 1).  Exploiting John Doe Company 1's "commitment to making its therapies available to people who are uninsured or need financial assistance to cover the treatment cost," the defendant and his co-conspirators used the computers of pharmacies that they operated in Queens and Manhattan, New York, to submit false Co-Pay Program claims for amounts of the Medication that the pharmacies never actually dispensed.  (PSR at ¶¶ 4, 8, 64).[1]

As intended, to assist patients in need of the Medication, John Doe Company 1 agreed to cover a portion of patients' out-of-pocket costs for the Medication.  (Id.).  When patients presented coupon cards to purchase the Medication, pharmacies would apply the benefit amount to the patient's co-payments and then request reimbursement from John Doe Company 1's program administrator, John Doe Company 2.  (PSR at ¶¶ 4, 8, 64).

The defendant manipulatively abused John Doe Company 1's sincere commitment to those in need by submitting false Co-pay Program claims through pharmacies that he controlled with his co-conspirators.  (PSR at ¶ 6).  To maximize the amount of money he could steal, the defendant organized his scheme to request reimbursement for an 18- or 21-day supply of the Medication, instead of the standard 28-day supply.  This allowed the defendant and his co-conspirators to submit more than one reimbursement application per month.  (Id.).  In the overwhelming majority of cases, the defendant and his co-conspirators requested more than $23,000 in reimbursement for each 18- or 21-day supply of the Medication.  Once in receipt of the fraudulently obtained reimbursement, the defendant would immediately disburse the money to various companies in an effort to conceal his fraud.  (Id.).

---

[1] Although the PSR states that prescriptions were generated to support the defendant's fictitious claims, the government's investigation showed that the defendant and his co-conspirators made claims on behalf of patients, many of whose identities were entirely fictitious, that were not supported by any documented prescriptions.  (See PSR at ¶ 6).

For example, on May 1, 2018, the defendant fraudulently obtained a $3.5 million Co-pay Program check and then caused nine checks totaling $2.4 million to be issued from the bank account of one of the pharmacies that he controlled, Pharmacy 1, to various companies over the next two days. (PSR at ¶ 7). By the time John Doe Company 2 detected the fraud, the funds had already been disbursed and could not be recovered. (Id.).

In addition, the defendant engaged in similar conduct with two other pharmacies. As with Pharmacy 1, between February 2017 and January 2018, the defendant and his co-conspirators accessed these pharmacies' computer systems to submit fabricated Co-pay Program claims, totaling approximately $4.8 million. (PSR at ¶ 8). As with Pharmacy 1, the defendant directed his co-conspirators to deposit checks into bank accounts that he controlled and would then liquidate the accounts quickly so the funds could be disbursed before his fraud was detected. (Id.). Ultimately, the defendant's scheme was revealed and he was arrested on June 11, 2020 at John F. Kennedy International Airport, where he was about to board a flight to Switzerland. (Id.).

During his pretrial release on a substantial and restrictive bond, the defendant continued to flout rules regulating his behavior. Specifically, between August 7, 2020 and October 17, 2020, the defendant violated his home detention conditions ten times by failing to provide his supervising officer with an itinerary of sites he visited when he was only approved to leave his residence to travel for religious services. (APSR at 3). On December 21, 2020, the defendant was remanded following his arrest in a case pending before the Honorable Ann M. Donnelly and, on or about April 14, 2022, this Court and Judge Donnelly ordered him released on bond pending sentence in this case.

III.    The Defendant's Guidelines Range and Criminal History

In his plea agreement, the defendant stipulated to a total Guidelines offense level of 24, based upon the same Guidelines calculation that the Probation Department has concluded is appropriate here. (PSR at ¶¶ 23, 68). Because the defendant's Criminal History Category is I, the applicable Guidelines' range of imprisonment is between 51 and 63 months. (Id. at ¶¶ 26, 68).

IV.    A Guidelines Sentence Is Appropriate

A.    Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 125 S. Ct. 738, 743 (2005); see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the

3

Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Later, in Gall v. United States, the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing judge should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the Court] may not presume that the Guidelines range is reasonable. [The Court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

B.  Argument

The government respectfully submits that the Court should impose a sentence within the advisory Guidelines range of imprisonment because such a sentence is appropriate to account for the "nature and circumstances of the offense" and to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(1)-(2)(A). A sentence within the Guidelines range will also promote specific and general deterrence. See id. at § 3553(a)(2)(B).

1.  Nature and Circumstances of the Offense

In a greedy gambit to enrich himself, the defendant elected to cynically steal more than $7 million from a company that sought to make a lifesaving medication widely available to the neediest among us. His post-hoc self-serving claims of contrition aside, the defendant was the organizer of this scheme and showed no signs of remedying his fraud until he was caught by law enforcement officers while en route to Switzerland. Although the defendant has agreed to pay restitution, the Victim Impact Statement that John Doe Company 1 submitted demonstrates that the defendant caused damage to John Doe Company 1 in the form of more than $7 million in losses and costs incurred in deploying "significant employee time investigating and remedying the fraud," which the defendant perpetrated by exploiting John Doe Company 1's concern for some of our Nation's neediest citizens. As such, the defendant's lies not only harmed a company dedicated to providing cutting-edge therapies to people suffering with a life-threatening disease, it also took resources away from vulnerable patients who depend on John Doe Company 1's medication reimbursement program to survive. When pharmaceutical companies suffer financial losses because of scams perpetrated by individuals concerned solely with lining their pockets, like the defendant, there is potential for medication prices to rise and become even more out of reach of the poor and sick. In short, the defendant's fraud was egregious and demands the significant punishment set forth in a Guidelines sentence.

4

2.     Seriousness of the Offense and Deterrence

A Guidelines sentence is necessary to reflect the seriousness of the offense, promote respect for the law and provide general deterrence.  As noted above, the defendant orchestrated his scheme to seek reimbursement of 18- or 21-day supplies of the Medication so that he and his co-conspirators could submit an additional fraudulent claim for around $23,000 per supply of the Medication each month.  In so doing, the defendant demonstrated that his sole focus was on maximally exploiting the largess of program designed to provide life-saving medication to the poor and needy.  Given the defendant's willingness to so blatantly place his greed above the interests of those most vulnerable, a Guidelines sentence is necessary to both deter him from committing additional frauds in the future and to send a message to those who would exploit beneficent programs for personal gain that the decision to do so will be met with the significant consequences reflected in a Guidelines sentence.[2]

Additionally, given that criminal conduct like the defendant's is typically difficult to detect and prosecute, there is a greater need for general deterrence.  See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").  Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."  See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

Congress recognized the need to afford adequate deterrence as "particularly important in the area of white collar crime" when it adopted Section 3553.  See S. Rep. No.

---

[2] The defendant's reference to his medical conditions in his sentencing submission only further underscores the need for specific deterrence here.  That the defendant's longstanding experience as a medical patient did nothing to deter him from stealing blatantly from a program designed to help less fortunate individuals, who were dealing with the significant effects of a life-threatening disease, only further underscores the need for the Court to impose a Guidelines sentence to ensure that the defendant will not commit future frauds.

98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259.  Congress rightly was disturbed that "white collar criminals often are sentenced to small fines and little or no imprisonment," and noted that, "[u]nfortunately, this creates the impression that certain offenses . . . can be written off as a cost of doing business."  Id.

In adopting the Section 3553 sentencing factors, Congress emphasized the essential deterrent value of imprisoning white collar criminals, even when those criminals themselves might be unlikely to reoffend:

> The Committee is of the view that in the past there have been many cases, particularly in the instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures . . . and because society required no insulation from the offender, without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of [a white collar criminal] . . . may be grossly inappropriate . . . in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.

Id. at 91-92.

In short, medical scam operators who seek to profit from fraud and deception, which costs companies, patients, and the pharmaceutical industry more than $7 million, should know that their decision to cheat and steal will result in stern consequences.

3.     Promote Respect for the Law and Provide Just Punishment

A Guidelines sentence should be imposed to reflect the seriousness of the offense, promote respect for the law and provide just punishment. Although the defendant elected to plead guilty, he played a major role as the organizer of a fraudulent scheme, which caused significant harm to John Doe Company 1's life-saving mission.  As explained in John Doe Company 1's Victim Impact Statement, the more than $7.2 million that the defendant stole would have been used to support patients suffering from a "serious and life-threatening" disease.  (APSR at 1-2).  These effects demand a significant punishment that is reflected in the Guidelines range of between 51 and 63 months' imprisonment. Such a sentence would be in keeping sentences imposed upon similarly-situated defendants. See, e.g., United States v. Murray, 14-CR-613 (RMB) (S.D.N.Y. 2015) (63-month sentence imposed upon defendant for orchestrating a substantial Medicaid fraud resulting in losses of over $1 million in Medicaid disbursement).

V.      Conclusion

       For the reasons discussed above, the government respectfully requests that the Court impose a Guidelines sentence of between 51 and 63 months' imprisonment to be followed by three years' supervised release and that the Court enter a forfeiture judgment in the agreed-upon amount of $489,534.25 and enter a restitution order of $7.2 million in favor of John Doe Company 1.

                              Respectfully submitted,

                              BREON PEACE
                              United States Attorney
                              Eastern District of New York

                    By:      /s/ Bradley T. King
                              Bradley T. King
                              Assistant U.S. Attorney
                              (631) 715-7900

cc:    Isabelle A. Kirshner & Wayne E. Gosnell, Esqs. (by ECF and E-mail)
       Probation Officer Steven S. Guttman (by E-mail)